# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANETTEA LANE,

                Plaintiff,

v.

MILWAUKEE COUNTY
DEPARTMENT OF SOCIAL
SERVICES CHILDREN AND
FAMILY SERVICES DIVISION,
LAURA REITZ,
JOHANNA BARKEI,
REBECCA EHRICK,
ISA GONZALEZ-ZAYAS,
BRENDA NORTON, and
ROBIN ORTIZ,

                Defendants.

Case No. 10-CV-297-JPS

ORDER

On April 8, 2010, plaintiff, Danettea Lane ("Ms. Lane"), initially filed a *pro se* complaint against the above-captioned defendants alleging violations of constitutional and statutory rights associated with the removal of plaintiff's children from her custody, as well as subsequent management of plaintiff's child welfare case. (Docket #1). On April 15, 2010, the court granted Ms. Lane's motion for leave to proceed *in forma pauperis*, but did not allow her to proceed on several of her claims because they were barred by the *Rooker-Feldman* doctrine. (Docket #5). Additionally, the court instructed Lane to amend her complaint before she would be permitted to serve defendants. (*Id.*). Plaintiff filed a Second Amended Complaint on April 19, 2010, with similar deficiencies. (Docket #7). The court found that Ms. Lane had not complied with the court's instructions in amending her complaint and denied plaintiff's motion to appoint her counsel. (Docket #9). On June 2, 2010,

plaintiff filed her Third Amended Complaint. (Docket #14). On October 28, 2010, the court screened plaintiff's Third Amended Complaint, dismissing several more of Lane's claims for failure to state a claim, but allowing Lane to proceed on select claims. (Docket #17). The Court characterized plaintiff's allegations as civil rights claims brought under 42 U.S.C. § 1983 and found that plaintiff had properly alleged violations of the Fourth and Fourteenth Amendments. (*Id.*). Specifically, the court found that Ms. Lane's claims appeared to argue that: 1) the defendants violated her Fourth Amendment rights when they conducted an illegal search and seizure at both her home and on the premises of her child's school; and 2) the defendants deprived the plaintiff of her liberty interests in her familial relations in violation of the Fourteenth Amendment. (*Id.*).

The defendants have all filed motions for summary judgment as to Ms. Lane's claims. Although initially Ms. Lane appeared *pro se* in this action, Attorney Tarena W. Franklin filed a notice of appearance as counsel for the plaintiff on May 26, 2011. However, this case is a bit unusual as Ms. Lane filed a *pro se* response to the defendants' motions for summary judgment. It appears that Ms. Lane has been dissatisfied with Attorney Franklin's representation of her and, therefore, has taken matters into her own hands. Nevertheless, Attorney Franklin has not sought leave to withdraw as counsel for the plaintiff and remains Ms. Lane's counsel of record in this action.[1]

In opposition to the defendants' motions for summary judgment, Ms. Lane has filed two similar memoranda and her own affidavit. However, she has not responded to any of the defendants' proposed statements of facts nor

---

[1]As such, it appears that the provisions of Civil Local Rule 56(a) regarding *pro se* parties does not apply.

has she filed her own proposed statement of facts. Because Ms. Lane has not contested any of the factual findings proposed by the defendants, the court is permitted to conclude that the facts, as identified by the defendants in their proposed findings of fact, are undisputed. *See* Civ.L.R. 56(b)(4); *see also Salvadori v. Franklin School Dist.*, 221 F. Supp. 2d 957, 960 (E.D. Wis. 2001) ("Because the plaintiff has not contested any of the factual findings proposed by the defendants as contemplated under Local Rule 56.2, the court is permitted to conclude that the facts, as identified by the defendants in their proposed findings of fact, are undisputed." (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994))).

1.      Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"The initial burden is on the moving party...to demonstrate that there is no material question of fact with respect to an essential element of the nonmoving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.,* 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)). Once the movant satisfies this initial burden, the burden then shifts to the nonmoving party who "may not rest upon the mere allegations or denials of his pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). There is no issue for trial unless the nonmoving party demonstrates that there is *sufficient evidence* in the nonmoving party's favor for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. If the evidence is "merely colorable" or is "not significantly probative," summary judgment may be granted. *Id.* Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact. In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007).

2. Discussion

This case stems from a child abuse investigation of the plaintiff by certain of the defendants beginning in September of 2007. Ms. Lane's Third Amended Complaint states claims against the following defendants: 1) Milwaukee County Department of Social Services Children and Family Division or the Wisconsin Department of Children and Families ("DCF");[2] (2) Isa Gonzalez-Zayas ("Ms. Zayas"); (3) Officer Robin Ortiz ("Officer Ortiz"); (4) Brenda Norton ("Ms. Norton"); (5) Laura Reitz ("Ms. Reitz"); (6) Johanna Barkei ("Ms. Barkei"); and (7) Rebecca Ehrick ("Ms. Ehrick"). The court will address each of the defendant's motions for summary judgment in turn as well as the undisputed facts that pertain to each defendant.

2.1    The Wisconsin Department of Children and Families

As an initial matter, the court notes that the Wisconsin Department of Children and Families is entitled to summary judgment. It is undisputed that the DCF is a state agency. Sovereign immunity bars an action against a state agency where, as here, it is clear that the state has not waived its immunity nor has Congress overridden it. *See Kroll v. Board of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991) (a "state agency is the state for purposes of the Eleventh Amendment."); *Brunken v. Lance*, 807 F.2d 1325, 1330 (7th Cir. 1986) (vacating an injunction issued against the State of Illinois' Department

---

[2]The Wisconsin Department of Children and Families asserts that it was incorrectly identified in plaintiff's Third Amended Complaint as the Milwaukee County Department of Social Services Children and Family Division – an entity which does not exist. Accordingly, the court will refer to the defendant as DCF instead of the Milwaukee County Department of Social Services Children and Family Division.

of Children and Family Services because such relief is barred by the Eleventh Amendment).[3]

### 2.2 Isa Gonzalez-Zayas

Plaintiff's Third Amended Complaint alleges that "defendant Isa Gonzalez-Zayas was at all relevant times an employee of [DCF]." (Third Am. Compl. ¶¶ 5, 15, 34(g)). In plaintiff's memorandum in opposition to Ms. Zayas' motion for summary judgment, plaintiff elaborates on her claims against Ms. Zayas, seemingly arguing that Ms. Zayas did not appropriately perform her duties as a guardian ad litem for Ms. Lane's children.

#### 2.2.1 Background

Ms. Zayas is an attorney licensed to practice law in Wisconsin. She is employed as a staff attorney for the Legal Aid Society of Milwaukee, Inc. ("LAS"). (Hill-Roberts Aff. ¶ 3; Defendant Zayas' Proposed Statement of Facts [ZPSF] ¶ 1). LAS is a not-for-profit private law firm that provides guardian ad litem services to the Milwaukee County Circuit Court, Children's Division ("Children's Court"). (Hill-Roberts Aff. ¶ 2, ZPSF ¶ 2). Accordingly, at all times relevant to the current action, Ms. Zayas was not an employee of any federal, state, or local government agency. (Hill-Roberts Aff. ¶ 3, ZPSF ¶ 3). More particularly, Ms. Zayas is not a social worker and she has never been employed by the DCF. (Hill-Roberts Aff. ¶ 3, ZPSF ¶ 4).

Ms. Zayas was appointed by Children's Court judges to act as a guardian ad litem for Ms. Lane's minor children in Child in Need of Protective Services ("CHIPS") proceedings pending in Children's Court.

---

[3] Even if the Eleventh Amendment did not bar an action against DCF, DCF would still be entitled to summary judgment on Ms. Lane's § 1983 claims against it because a state agency is not a "person" amenable to a § 1983 suit. *See Illinois Dunesland Preservation Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719, 721 (7th Cir. 2009).

(Hill-Roberts Aff. ¶ 4; ZPSF ¶ 5). As a guardian ad litem, Ms. Zayas' responsibility is to be an advocate for the best interests of the child for whom the appointment is made, and her undivided loyalty is owed to the minors whose interests she is appointed to represent and not to the State of Wisconsin nor to Milwaukee County. (Hill-Roberts Aff. ¶ 4; ZPSF ¶ 6). Ms. Zayas' only contact with plaintiff was in her capacity as a guardian ad litem for three of plaintiff's minor children. (Zayas Aff. ¶ 5). Ms. Zayas never entered plaintiff's home and she never assisted any federal, state, or local government employee in removing any of plaintiff's children from her home or from any school. (ZPSF ¶ 8).

### 2.2.2 Analysis

In any § 1983 action, a plaintiff must establish that the conduct complained of was committed under color of state law and that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Ms. Zayas is entitled to summary judgment on Ms. Lane's claims against her because a guardian ad litem is not a state actor subject to liability under 42 U.S.C. § 1983. *See Nelson v. Kujawa*, No. 07-CV-741, 2008 WL 2401260, at * 2 (E.D. Wis. June 11, 2008) (stating that "state-appointed guardians ad litem are not state actors subject to liability under 42 U.S.C. § 1983") (citing *Kirtley v. Rainey*, 326 F.3d 1088, 1091 (9th Cir. 2003)); *Meeker v. Kercher,* 7782 F.2d 153, 155 (10th Cir. 1986) (stating that guardians ad litem do not act under color of state law for purposes of § 1983 because they have no obligation to the state and owe their undivided loyalty to the minor).

In this case, it is undisputed that Ms. Zayas is not a government employee and that she acted only as an independent guardian ad litem in the underlying Children's Court proceedings. The record is devoid of facts

Case 2:10-cv-00297-JPS   Filed 10/28/11   Page 7 of 28   Document 110

supporting any theory that Ms. Zayas acted under color of state law or conspired with state actors and did not exercise independent judgment. Accordingly, Ms. Lane has not established a cause of action against Ms. Zayas under § 1983 and, therefore, Ms. Zayas is entitled to summary judgment as to any claims asserted against her in this matter.[4]

### 2.3    Officer Robin Ortiz

The plaintiff appears to claim that Officer Robin Ortiz ("Officer Ortiz") violated the plaintiff's Fourth Amendment rights by interviewing Ms. Lane's minor son at his public school and by interviewing Ms. Lane at her residence. (Third Am. Compl. ¶ 14; Oct. 28, 2010 Order at 4-5). The plaintiff also appears to claim that Officer Ortiz violated her Fourteenth Amendment rights by depriving her of her liberty interest in familial relations. (Third Am. Compl. ¶¶13- 14, 18, 53; Oct. 28, 2010 Order at 4-5).

#### 2.3.1    Background

According to Officer Ortiz, on Friday, September 21, 2007, he was dispatched to Kagel Elementary School in Milwaukee, Wisconsin, to investigate an allegation of physical abuse to a child. (Officer Ortiz's Proposed Findings of Fact [OPFF] ¶ 1).  Upon arrival, Officer Ortiz interviewed the school's social worker who stated that one of the teachers

---

[4]Even if plaintiff's claims against Ms. Zayas were not otherwise barred, Ms. Zayas would also likely be entitled to quasi-judicial immunity. *See Paige K.B. v. Molepske*, 219 Wis.2d 418, 427 (1998) ("A GAL appointed by the circuit court under Wis. Stat. § 767.045 is absolutely immune from negligence liability for acts within the scope of that GAL's exercise of his or her statutory responsibilities."); *see also Marr v. Me. Dep't of Human Servs.* 215 F.Supp.2d 261, 267 (D. Me. 2002) (holding that "absolute judicial immunity attaches when a guardian ad litem performs certain delegated duties because of the intimate relationship between the GAL and the court in the judicial process"); *Offutt v. Kaplan*, 884 F.Supp. 1179, 1192-93 (N.D. Ill. 1995) (concluding that as a guardian ad litem, the defendant acted as a judicial officer and was entitled to immunity).

had notified her that a student had an injury. (OPFF. ¶ 2). That teacher told Officer Ortiz that she interviewed the child, identified herein as J.J., and that she had viewed J.J.'s injury and asked him what had happened. (*Id.*). J.J. replied that his mother had hit him with a belt. (*Id.*). The teacher also told Officer Ortiz that the day before, J.J.'s mother – Ms. Lane – was called to school because J.J. had thrown up on the playground, and that another teacher overheard Ms. Lane state to J.J. "I am going to whoop your ass." (*Id.*). Armed with this information, Officer Ortiz then interviewed J.J. (OPFF ¶ 3). J.J. told Officer Ortiz that on Thursday, September 20, 2007, at about 7:00 p.m., his mother got mad at him for misbehaving at school, went to her bedroom, grabbed a belt, and hit him twice, once across the right ear and once across the right hip. (*Id.*). During the interview, Officer Ortiz observed a visible injury to J.J.'s ear. (*Id.*). Officer Ortiz then contacted the Wisconsin Bureau of Milwaukee Child Welfare ("BMCW"), and BMCW employee, Brenda Norton – also a defendant in this matter – appeared at the elementary school and took custody of J.J. (*Id.* ¶ 5). Ms. Norton conveyed J.J. to the Child Protection Center where he was evaluated by a doctor, who, after conducting a medical examination, found a contusion to the right ear of J.J. (*Id.*).

Officer Ortiz next proceeded to J.J.'s residence to interview Ms. Lane. (OPFF ¶ 6). Ms. Lane denied ever telling her son she was going to "whoop" him, and stated that when J.J. left for school that morning she had not noticed any injuries to him. (*Id.*). Ms. Lane further told Officer Ortiz that on September 20, 2007, her son was playing outside the home with other neighborhood children and that one of the neighbors saw J.J. and the other children hitting each other with broom handles. (*Id.*). Officer Ortiz interviewed several neighbors. (OPFF ¶¶ 7-9). One neighbor confirmed the

children were playing with broom handles, but she stated that she did not see them hitting one another. (OPFF ¶ 7). Two neighbors stated they saw the children playing but did not observe anyone swinging broom handles. (OPFF ¶¶ 8-9). Officer Ortiz again interviewed Ms. Lane who continued to deny ever abusing J.J., but she did admit that she disciplined him about one week prior for attempting to smoke a cigarette. (OPFF ¶ 10). Ms. Lane also told Officer Ortiz that she "whooped" J.J. across his bottom with a belt. (*Id.*). While at Ms. Lane's home the second time, Ms. Norton met Officer Ortiz and took J.J.'s younger brother – referred to herein as C2 – into protective custody. (OPFF ¶ 11). Officer Ortiz's investigation was reviewed by the Milwaukee County District Attorney's Office, but no charges were issued. (OPFF ¶ 12).

### 2.3.2   Analysis

The Fourth Amendment's prohibition against unreasonable searches and seizures applies in the context of child abuse investigations by governmental authorities. *Michael C. Gresbach*, 526 F.3d 1008, 1010-11 (7th Cir. 2008) (citing *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003)). First, the court's analysis assumes that Officer Ortiz's actions in interviewing J.J. constitute both a search and a seizure under the Fourth Amendment.[5] When a search or seizure is conducted on the premises of a public school with the consent

---

[5] Neither party addresses this threshold issue, but rather, both simply assume that Officer Ortiz's investigation and interview of J.J. constituted either a search or a seizure within the meaning of the Fourth Amendment. Accordingly, the court will assume as much for purposes of this motion for summary judgment, as his actions could be construed as taking J.J. into custody for the purpose of interviewing him. *See Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (finding that defendants' investigations of allegations of child abuse constituted a search and seizure within the meaning of the Fourth Amendment because they took the alleged victim into custody and interviewed him).

of school officials, the more lenient standard of scrutiny developed in *Daryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986) should be used to guide a court's Fourth Amendment reasonableness analysis. In *Daryl H.*, the Seventh Circuit Court of Appeals explained that in determining whether a search is reasonable, courts should balance "the need of a particular search against the invasion of personal rights that the search entails" by considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 903. Additionally, the Supreme Court's decision in *Terry v. Ohio*, 801 F.2d 1, 19-20 (1968) makes clear that courts should inquire whether the action was "justified at its inception," and whether the conduct of the search was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

Under the *Daryl H.* framework, Ortiz's investigative interview of J.J. was justified at its inception because it was prompted by reports of abuse by J.J.'s teacher and a school social worker. Both the teacher and the social worker told Ortiz that J.J. had a visible injury to his ear, that J.J. had told school staff that the injury was caused by his mother, and that school staff overheard Ms. Lane the day before stating that she was going to "whoop" J.J. Furthermore, the scope of Officer Ortiz's investigation was exceedingly narrow. He merely observed the injury to J.J.'s ear and heard a statement from J.J. that Ms. Lane had caused the injury by hitting him with a belt. Moreover, the record does not reflect that Ortiz's interview of J.J. was conducted in an offensive or unnecessary manner. Indeed, it appears to have been a relatively short interview, on public school grounds, with the consent of school officials. Given the state's obligation to prevent loss of life and to prevent serious injury to minors, as well as the seriousness of J.J.'s allegation

that his mother whipped him, interviewing him at school was not an overly intrusive way to determine whether he was being abused. Accordingly, the court finds that, as a matter of law, defendant Ortiz has established that his search and seizure of J.J. was constitutional, and the court will grant Ortiz's motion for summary judgment as to this claim.

Next, the court moves to whether Officer Ortiz's questioning of Ms. Lane violated her Fourth Amendment rights. First, it does not appear that Officer Ortiz's questioning of Ms. Lane was a search or seizure within the meaning of the Fourth Amendment. Indeed, as the Seventh Circuit has noted, "questions are neither searches nor seizures," and thus, "police need not demonstrate justification for each inquiry." *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002). Even if the court assumes Officer Ortiz's questions amounted to a search or seizure, Ms. Lane makes no argument regarding consent. Indeed, her actions in allowing Officer Ortiz into her home and in answering his questions belies any assertion that Officer Ortiz lacked consent. Furthermore, Ms. Lane was clearly capable of refusing consent as she later refused to answer questions posed to her by defendant Brenda Norton. In any event, there is nothing to suggest that Officer Ortiz's actions were unreasonable under the Fourth Amendment. Though he did not have a warrant to enter Ms. Lane's home, Officer Ortiz was clearly justified in doing so for the same reasons – as discussed below – that the court finds defendant Norton was justified in removing Ms. Lane's children from her custody.

Lastly, the court will consider Ms. Lane's familial relations claim as it relates to Officer Ortiz. Ms. Lane alleges that the manner in which the defendant conducted his investigation violated her constitutional right to familial relations under the Fourteenth Amendment's Due Process Clause.

The Supreme Court has long recognized, as an element of substantive due process, that parents have a liberty interest in familial relations, which includes the right to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Troxel v. Granville,* 530 U.S. 57, 65 (2000) (noting that the right to familial relations is "the oldest of the fundamental liberty interests recognized"). However, this liberty interest is limited by the government's interest in protecting children from abuse. *Doe v. Heck*, 327 F.3d at 520 (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000)). To maintain the appropriate balance, caseworkers or law enforcement must have "evidence to support a 'reasonable suspicion' of past or imminent abuse" before they may interfere with the right to familial relations. *Terry v. Richardson,* 346 F.3d 781, 787 (7th Cir. 2003). "A reasonable suspicion requires more than a hunch but less than probable cause." *United States v. Oglesby,* 597 F.3d 891, 894 (7th Cir. 2010) (citations and internal quotation marks omitted).

Here, Officer Ortiz's suspicion of past and possible imminent abuse by Ms. Lane was based on definite and articulable evidence—namely, J.J.'s allegations that his mother whipped him with a belt and the physical injuries supporting these allegations. Additionally, the undisputed facts show that Officer Ortiz only interfered with Lane's right to familial relations to the extent necessary to prevent that abuse. Significantly, Officer Ortiz was not responsible for removing J.J. or Ms. Lane's other children from her custody. He simply questioned both J.J. and Ms. Lane about the allegations of abuse. Accordingly, the court finds no substantive due process violation on the part of Officer Ortiz. As such, Officer Ortiz is entitled to summary judgment as to all of Ms. Lane's claims against him.

### 2.4 Brenda Norton

Brenda Norton is an Initial Assessment Social Worker ("IASW") with the Bureau of Milwaukee Child Welfare within the DCF. (Norton's Proposed Findings of Fact [NPFF] ¶ 6). Norton is the individual who removed J.J. and C2[6] from Ms. Lane's custody. (NPFF ¶ 7). Ms. Lane appears to be proceeding against Norton on five claims brought under 42 U.S.C. § 1983: (1) a Fourth Amendment claim based on Norton's interview of J.J. at his school; (2) a Fourth Amendment claim based on Norton's interview of Ms. Lane at her home; (3) a Fourth Amendment claim alleging that Norton should not have placed J.J. and C2 into custody; (4) a substantive due process claim alleging that Norton's involvement in the investigation of Lane's child abuse violated Lane's liberty interest in familial relations; and (5) a procedural due process claim alleging that Norton's placement of Lane's sons into protective custody interfered with her liberty interest in familial relations without a proper hearing.

As an initial matter, Norton argues that Ms. Lane failed to answer dispositive requests to admit within thirty days and, therefore, she is deemed to have admitted those requests. Fed. R. Civ. P. 36(b); *See Walsh v. McCain Foods, Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996) ("a party who fails to respond to requests for admissions within 30 days is deemed to have admitted those requests."). Among those requests to admit was the following: "Admit that Brenda Norton did not violate your constitutional rights in any manner at any time." (NPFF ¶ 13). Accordingly, Norton argues that Ms. Lane's failure to answer this request should result in the default admission that Norton did not violate her constitutional rights in any manner at any time. In turn,

---

[6]C2 is J.J.'s brother, another of Ms. Lane's biological children.

Norton argues she is entitled to judgment as a matter of law and Ms. Lane's constitutional claims against her should be dismissed.

Ms. Lane clearly failed to respond to Norton's requests for admissions within the time specified by Rule 36. However, Ms. Lane did answer the requests for admissions in her brief in opposition to the defendants' motions for summary judgment. (Docket #93). Yet, these responses came three months after they were first received by Ms. Lane and after defendant Norton had already filed a motion for summary judgment. While Fed.R.Civ.P. 36(b) provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," Ms. Lane has not sought the court's permission to withdraw or amend these admissions. Consequently, because of Ms. Lane's unwarranted delay in responding to the requests and her failure to seek withdrawal or amendment of the admissions, the matters in the request to admit were conclusively established. Thus, Ms. Lane's constitutional claims against Brenda Norton fail and must be dismissed.

Yet, even setting aside Ms. Lane's failure to answer the dispositive requests to admit, the plaintiff's claims against Norton fail on their merits as well. The court will first detail the undisputed facts as they relate to Ms. Norton before proceeding to an analysis of Ms. Lane's claims against her.

### 2.4.1   Background

Like Officer Ortiz, Brenda Norton was called to J.J.'s school to investigate his allegations of physical abuse. (NPFF ¶ 23). Norton received the same information from school authorities as did Officer Ortiz, namely that J.J. told his teacher his mother had whipped him with a belt the night before and that his mother had threatened him the previous day by saying "I am going to whoop your ass." (NPFF ¶ 22). During the interview with

Norton, J.J. explained that he was feeling pain on his left side and on his right ear. (NPFF ¶ 27). Norton noticed an abrasion on J.J.'s right ear. (*Id.*). J.J. also told Norton that Ms. Lane had told J.J. "don't get too comfortable, she knew I was going to get a whipping." (NPFF ¶ 28). During the interview, J.J. told Norton that he could remember Ms. Lane hitting him with a belt one other time. (NPFF ¶ 29). J.J. also told Norton that he had a scar on his right calf that resulted from being burned with an iron. (NPFF ¶ 30). J.J. stated that the iron injury was an accident, but he could not give Norton detailed information regarding the incident. (NPFF ¶ 31). Next, Norton took J.J. into custody. (NPFF ¶ 32). Norton accompanied J.J. to a medical evaluation at the Child Protection Center. (NPFF ¶ 33). The evaluation was conducted by Dr. Judy Guinn, who stated that the abrasion on J.J.'s right ear was consistent with being whipped by a belt rather than as a result of ordinary child's play. (NPFF ¶ 34).

Norton then accompanied Officer Ortiz to Ms. Lane's residence to follow up on the allegations of child abuse. (NPFF ¶ 36). Ms. Lane was standing outside at the time of their arrival. (NPFF ¶ 38). Norton explained to Ms. Lane that she was there to investigate allegations of child abuse. (NPFF ¶ 39). With the front door of the residence unlocked and ajar, Norton and Officer Ortiz proceeded into the house, followed by Ms. Lane. (NPFF ¶ 40). Norton then questioned Ms. Lane about the allegations of abuse. During the interview, Ms. Lane stated that she was not aware of what caused J.J.'s ear injury and claimed not to have noticed it. (NPFF ¶ 41). Ms. Lane also admitted that she had used a belt to whip J.J. across the bottom sometime during the week before J.J.'s ear injury. (NPFF ¶ 42). Upon further questioning, Ms. Lane became upset and refused to answer additional questions. (NPFF ¶ 43). Specifically, Ms. Lane refused to answer Norton's

questions regarding a prior referral to DCF, dated May 9, 2006, which was not completely investigated due to DCF's inability to locate Ms. Lane at the time. (NPFF ¶ 44). The prior referral alleged that Ms. Lane went from house to house where there was drug dealing and substance abuse, as well as alleged that Ms. Lane would be gone for days at a time. (NPFF ¶¶ 45, 55). Ms. Lane also refused to allow Norton beyond the kitchen area, which prevented Norton from assessing the conditions of the children's bedrooms. (NPFF ¶ 46).

After the interview of Ms. Lane, Norton made the decision to take Ms. Lane's other child, C2, into protective custody directly from the residence. (NPFF ¶¶ 48-49). Norton gave Ms. Lane a Notification of Court hearing form stating that J.J. and C2 were being taken because "probable cause exists to believe that if the child is not held, he/she will cause injury to himself/herself or be subject to injury by others." (NPFF ¶ 51). The form notified Ms. Lane that the court date was set for Monday, September 25, 2007. (*Id.*).

### 2.4.2    Analysis

#### 2.4.2.1  Fourth Amendment Claims

Norton is entitled to summary judgment as to all of Ms. Lane's Fourth Amendment claims. First, the court finds that Norton's questioning of J.J. at his public school was reasonable and did not constitute a Fourth Amendment violation  for the same reasons it found Officer Ortiz's actions reasonable in this respect. Additionally, taking J.J. to be physically examined by a medical doctor to see if he had any serious injuries was similarly reasonable because his allegations that his mother whipped him with a belt were substantiated by a physical marking on his ear and he had complained of pain on his left side. Indeed, in *Michael C. v. Gresbach*, the Seventh Circuit noted that under non-exigent circumstances, before making their own visual inspections, child

welfare workers could take preliminary steps short of searches, by having a medical doctor perform the search. 526 F.3d at 1016. Thus, having a physician conduct a medical exam in response to J.J.'s complaints of pain and allegations of abuse was well within the confines of the Fourth Amendment.

Next, Norton's investigation at Ms. Lane's home did not amount to a Fourth Amendment violation. Again, similar to the court's findings with respect to Officer Ortiz, it does not appear that Norton's questioning of Ms. Lane amounted to a "search" under the Fourth Amendment. However, even assuming Norton's actions constituted a search, there is some question as to whether Lane could be deemed to have consented to the "search" at her home. Based on the undisputed facts, it appears that Ms. Lane did not refuse Norton entry to the residence, and Ms. Lane responded voluntarily to questions, at least at first. She also refused Norton access beyond the kitchen area, indicating she was quite capable of refusing consent.

In any event, assuming Norton's actions constituted a warrantless search that lacked consent, Norton's investigation was still justified because it was based on exigent circumstances. *Michael C. v. Gresbach*, 526 F.3d at 1014 (noting that absent a warrant, "officials may make a search or seizure under exigent circumstances, where they have reason to believe life or limb is in jeopardy."). Norton had evidence that would have warranted any prudent caseworker to believe that Ms. Lane's children were in danger. Not only did J.J. repeatedly allege that his mother whipped him with a belt, but physical markings and a medical doctor's opinion substantiated these allegations. What is more, Norton also had knowledge that Ms. Lane had been referred to DCF in the past. The totality of the circumstances suggest that the "search" was reasonable and that Norton did not violate Ms. Lane's Fourth Amendment rights by questioning her at her home.

Lastly, Norton's seizure of J.J. and C2 did not violate the Fourth Amendment. In the context of removing a child from his home and family, "a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances…" *Siliven v. Dept. of Child Services*, 635 F.3d 921, 927 (7th Cir. 2011). Here, Norton did not have a court order, thus her removal of the children from Ms. Lane's custody must have been supported by probable cause or exigent circumstances. As previously noted above, the physical markings on J.J.'s ear, combined with a medical doctor's opinion stating those marks were consistent with physical abuse, and the statements from J.J. indicating that Ms. Lane inflicted the ear injury by whipping him with a belt is evidence that would warrant a reasonable caseworker to believe that Ms. Lane's children were in danger. The Seventh Circuit's recent decision in *Siliven v. Dept. of Child Services*, 635 F.3d 921, supports this determination. In *Siliven,* a caseworker discovered that a child had bruises on his arm and that his father was previously reported for abuse of another child. *Id.* at 923-24. After a medical doctor suggested the bruises were consistent with an adult grabbing his arm, the caseworker removed the child from his father's custody but allowed the child to stay with his mother at a different residence. *Id.* at 924. The Seventh Circuit found that the caseworker had probable cause to remove the child from his father's custody, reasoning that the physical evidence combined with the doctor's corroboration and the father's alleged history of child abuse was "sufficient to warrant a prudent caseworker in believing that [the child] was in danger." *Id.* at 927. The court also noted that, though the evidence was far from conclusive as to how the child was injured and whether the suspected parent was involved, probable cause does not demand probability. *Id.* Here, the facts are very much consistent with the facts in *Siliven*. Indeed, the

allegations of abuse in this case are more extreme, as the evidence indicated that Ms. Lane whipped J.J. with a belt, rather than forcibly grabbed the child's arm. And, furthermore, while the *Siliven* court's finding of reasonableness was influenced by the caseworker's decision to have the child remain with his mother – a less intrusive interference than placing the child in state custody – Norton had no such viable option. Based on the undisputed facts presented herein, it appears that Norton's only option to protect both J.J. and C2 from further abuse was to place them into protective custody.

The court also finds that exigent circumstances existed to place J.J. and C2 into protective custody. According to the Seventh Circuit, in order to demonstrate exigent circumstances, "defendants must show that, in light of the circumstances known to the defendants at the time of the removal decision, reasonable experienced caseworkers would have believed that the child was in physical danger in the home." *Siliven*, 635 F.3d at 929. Because Norton possessed evidence indicating that Ms. Lane physically abused J.J., she had a reasonable basis for believing that Ms. Lane's other child, C2, was also in danger. Accordingly, Ms. Lane cannot prevail on her Fourth Amendment claims against Norton and, therefore, Norton is entitled to summary judgment on these claims.

### 2.4.2.2  Substantive Due Process Claim

Ms. Lane also presents a substantive due process claim. As noted by Norton, to the extent this claim is premised on the seizure of J.J. and C2, it cannot succeed. "Substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon." *Brokaw*, 235 F.3d at 1017 (citing *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997)). Since any substantive due process claims against Norton are

related to the removal of J.J. and C2, the claims are covered by the Fourth Amendment. Accordingly, the court need not analyze Ms. Lane's claims under the Fourteenth Amendment.

### 2.4.2.3 Procedural Due Process

Lastly, Ms. Lane appears to allege a procedural due process claim, asserting that the removal of her children from her custody without a hearing violated the due process clause of the Fourteenth Amendment. In *Siliven*, the Seventh Circuit noted that due process requires, at a minimum, that governmental officials "'not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances.'" *Siliven*, 635 F.3d at 929 (quoting *Brokaw,* 235 F.3d at 1020). In the context of removing a child from his home, Norton must show that, in light of the facts and circumstances known to her at the time of the removal decision, reasonable, experienced caseworkers would have believed that the child was in immediate physical danger in the home. *Id.* As discussed above, the court has already found that a reasonable caseworker would have drawn that conclusion in this case based on the physical evidence of abuse – corroborated by a medical doctor's opinion – and J.J.'s allegations. As such, the court finds that Norton is entitled to summary judgment as to all of Ms. Lane's claims.

### 2.5    Rebecca Ehrick

It appears that Ms. Lane states one claim against defendant Ehrick, stemming from her involvement in the removal of one of Ms. Lane's children – C3 – from her custody. (Am. Compl. ¶ 34(e)).

#### 2.5.1    Background

Ehrick worked for La Causa at the time of the alleged violations, an organization which contracted with the Bureau of Milwaukee Child Welfare

Services ("BMCW") to provide child protective case management services. (Ehrick Proposed Findings of Fact [EPFF] ¶ 3). As previously noted by the court, plaintiff's involvement with BMCW began in September of 2007 when her first two children, J.J. and C2, were removed from her custody. (EPFF ¶ 4). Ehrick became plaintiff's ongoing case manager in February of 2008. (EPFF ¶ 15). In April of 2008, Ms. Lane informed Ehrick that she was six months pregnant. (EPFF ¶ 16). Ms. Lane gave birth to C3 in August of 2008. (EPFF ¶ 16). Pursuant to BMCW protocol, Ehrick called 220-SAFE, the child abuse/neglect hotline, when she learned of the birth of C3 because Ms. Lane already had children in out of home care. (EPFF ¶ 17).

In response to this phone call, Initial Assessment Social Worker Amy Raska ("Raska")[7] went to the hospital to assess the situation. (EPFF ¶ 18). Raska met with plaintiff and learned that C3's meconium had tested positive for marijuana and that plaintiff had been refusing to give urine samples. (EPFF ¶ 20). Raska then informed plaintiff that she would be taking C3 into custody and that C3 would be placed in out of home care. (EPFF ¶ 21).

Ehrick then memorialized all of Raska's findings in an initial Permanency Plan. (EPFF ¶ 23). The Permanency Plan detailed the events that had taken place beginning with the assignment of Raska for the emergency initial assessment through Raska's decision to place C3 with a foster family. (EPFF ¶ 24). Ehrick proposed a dual permanence plan of reunification and adoption and filed the plan with the Children's Court for its consideration on August 26, 2008. (EPFF ¶¶ 25-26). On September 3, 2008, Ehrick attended an initial appearance hearing during which the Children's Court determined that the CHIPS petition was legally sufficient. (EPFF ¶ 27). Ehrick's

---

[7]Raska is not a named defendant in this action.

involvement with plaintiff ceased after this hearing and a new case manager was assigned to Ms. Lane. (EPFF ¶ 28).

### 2.5.2 Analysis

Plaintiff's claim against Ehrick, to the extent it is premised on Ehrick's removal of C3 from plaintiff's custody, fails as a matter of law. Assuming the claim falls under the Fourth Amendment, the undisputed facts show that Ehrick did not physically remove C3 from Ms. Lane's custody, nor did she make the decision to do so. As such, Ehrick cannot be said to have seized C3. The extent of Ehrick's involvement was following BMCW protocol by calling 220-SAFE after C3 was born and memorializing in a permanency plan the findings made by Raska. It was Amy Raska, then, who assessed the situation and made the ultimate decision to remove C3 from Ms. Lane's custody. Accordingly, Ehrick is entitled to summary judgment as to Ms. Lane's claims against her.

## 2.6 Johanna Barkei and Laura Reitz

### 2.6.1 Background

Johanna Barkei became involved in plaintiff's case in 2009 when she became the supervisor of Ms. Lane's case manager, Vera Montgomery. (Barkei and Reitz's Proposed Findings of Fact [BRPFF] ¶ 29). Laura Reitz became Ms. Lane's case manager shortly thereafter under the supervision of Barkei. (BRPFF ¶ 30). At this time, Ms. Lane began missing visitations and the defendants could not reach her. (BRPFF ¶ 31). Reitz began contacting local hospitals to see if Ms. Lane – who was pregnant at the time – had given birth. (BRPFF ¶ 32). Ms. Lane eventually contacted Reitz on October 14, 2009, and told Reitz that she had given birth to C4, had been released from the hospital, and was on her way home with the baby. (BRPFF ¶¶ 33-34). After consultation with Barkei, Reitz called 220-SAFE based on the fact that

Ms. Lane's other three children were all in out of home placement. (BRPFF ¶ 35). Reitz and Barkei assert that they were concerned for C4's safety because Ms. Lane was undergoing anger management therapy at the time to treat what had been diagnosed as Intermittent Explosive Disorder. (BRPFF ¶ 36). Reitz informed Ms. Lane that she would need to visit plaintiff's home to perform a home study and ensure the safety of C4. (BRPFF ¶ 37). At the time, plaintiff lived with C4's father, Virgil Ikner ("Ikner") and his three children and one grandchild. (BRPFF ¶¶ 38, 40).

During their visit to the residence, Reitz and Barkei observed that plaintiff had supplies for C4 and that C4 appeared neat and clean. (BRPFF ¶ 44). Reitz and Barkei informed plaintiff and Ikner that they would return to the office and determine what steps to take, noting it was possible they would return to the house with the Initial Assessment team. (BRPFF ¶ 45). Reitz and Barkei returned to the residence later that day with the Initial Assessment team and found the home had been cleaned up by that time. (BRPFF ¶48). The Initial Assessment team assessed the situation and determined that C4 did not need to be detained at that time. (BRPFF ¶ 49). Instead, Initial Assessment implemented an in-home safety plan, which included a parent aid visiting the home both announced and unannounced throughout the week. (BRPFF ¶¶ 50-51). As part of the visit, the parent aid was to check for a diaper rash – in order to ensure that Ms. Lane was changing C4's diapers and keeping C4 clean, healthy and safe. (BRPFF ¶ 52). Reitz continued as plaintiff's case manager , with Barkei as the supervisor, until November 2010. (BRPFF ¶ 54).

### 2.6.2 Analysis

According to the plaintiff, defendants Reitz and Barkei violated the Fourth Amendment right to be free from unreasonable searches by ordering

the "strip searching" of C4 for the first four months of C4's life. This visual search included the taking off of C4's shirt and diaper to make sure there were no markings, checking to see if C4 had diaper rash, and ensuring that C4 smelled clean. The Fourth Amendment applies to physical examinations conducted by child welfare workers. *Darryl H. v. Coler*, 801 F.2d at 900. In *Darryl H.*, the Seventh Circuit noted that physical inspection is "a significant intrusion into the child's privacy," yet, at the same time, "the state has an obligation to prevent loss of life and serious injury to…the young." *Id.* at 902. The court commented on the value of a visual inspection, noting that it can provide "quick and objective information" especially in cases of child abuse where time is a significant factor. *Id.* As such, the Seventh Circuit recognized that neither a warrant nor probable cause is necessary before a child welfare worker can conduct a visual inspection. *Id.* at 904. However, the search must still be reasonable under the Fourth Amendment, meaning the action must have been "justified at its inception" and the conduct of the search must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 903 (quoting *Terry v. Ohio,* 392 U.S. at 19-20.

In this case, the undisputed facts demonstrate that the visual inspection of C4 was reasonable. First, Ms. Lane already had children in out of home placement due to allegations of physical abuse. Furthermore, plaintiff was undergoing anger management therapy for Intermittent Explosive Disorder. These two factors combined warranted the visual inspection in order to ensure the safety of C4 in plaintiff's care. What is more, the manner in which the inspection was conducted was reasonable. It occurred during a time when C4 already had to be disrobed for a diaper change and it surveyed areas of the body vulnerable to abuse and neglect.

Indeed, the quick visual inspection that occurred here was much less intrusive than the removal of C4 from Ms. Lane's custody. For all of these foregoing reasons, the court concludes that neither Reitz, nor Barkei as her supervisor, violated the Fourth Amendment by ordering a visual inspection of C4.

As to Ms. Lane's Fourteenth Amendment claims, they fail for the same reason such claims failed against defendant Norton, that is because substantive due process "should not be called upon when a specific constitutional provision protects the right allegedly infringed upon." *Brokaw*, 235 F.3d at 1017 (citing *United States v. Lanier*, 520 U.S. at 272 n. 7). Because it appears Ms. Lane's familial relations claims relate to the removal of C3 and the visual search of C4, and these claims are covered by the Fourth Amendment, they may not also be analyzed under the Fourteenth Amendment.

### 2.7. Qualified Immunity

The doctrine of qualified immunity insulates government actors from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Pearson v. Callahan*, 555 U.S. 223 (2009). In other words, the doctrine protects public officials "who act in ways they reasonably believe to be lawful," and thus leaves "ample room for mistaken judgments." *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted).

Qualified immunity claims present two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815. Courts are free "to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. In this case, the court began with the first prong and found that plaintiff's allegations as to every defendant who asserted a qualified immunity defense – Officer Ortiz, Brenda Norton, Rebecca Ehrick, Laura Reitz, and Johanna Barkei – did not make out a deprivation of a constitutional right. Even assuming plaintiff's allegations made out a deprivation of a constitutional right, the court's review of the facts and relevant case law demonstrates that the defendants would still be entitled to qualified immunity as to all of plaintiff's claims because the rights at issue were not clearly established at the time of the alleged misconduct.

3.    Conclusion

In sum, there is no evidence of any misconduct on the part of any defendant. No defendant violated Ms. Lane's or her children's constitutional rights under the Fourth or Fourteenth Amendments. Accordingly, all defendants are entitled to summary judgment as to all of plaintiff's claims.

Therefore,

IT IS ORDERED that defendants Johanna Barkei, Rebecca Ehrick, and Laura Reitz's motion for summary judgment (Docket #63) be and the same is hereby GRANTED as to all of plaintiff's claims;

IT IS FURTHER ORDERED that defendants Milwaukee County Department of Social Services Children and Family Services Division (also known as the Wisconsin Department of Children and Families) and Brenda Norton's motion for summary judgment (Docket #70) be and the same is hereby GRANTED as to all of plaintiff's claims;

IT IS FURTHER ORDERED that defendant Robin Ortiz's motion for summary judgment (Docket #75) be and the same is hereby GRANTED as to all of plaintiff's claims;

IT IS FURTHER ORDERED that defendant Isa Gonzalez-Zayas' motion for summary judgment (Docket #83) be and the same is hereby GRANTED as to all of plaintiff's claims; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED on its merits together with costs as taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of October, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge